OPINION OF THE COURT
Judith J. Gische, J.
“One man’s ceiling is another man’s floor.” (Paul Simon.)
*921 Upon the credible evidence adduced at trial the court makes the following findings of fact and conclusions of law:
Plaintiffs are the rent-stabilized tenants of combined apartment 9B (combined apartment) in the building located at 508 West 112th Street in Manhattan (building). Defendants 508 West 112th Street, Inc. and Nunz Realty, LLC are respectively the former and present owners of the building (collectively owner). The heart of the parties’ dispute is whether the exterior area (EA) to the combined apartment is a roof terrace that is an amenity of plaintiffs’ rent-stabilized tenancy or simply a roof, plaintiffs’ use of which is subject to a revocable license.
The combined apartment is located on the top, ninth floor of the building. There is a recess on all sides of the combined apartment that begins from the exterior point of the building on the eighth floor to the exterior walls of the combined apartment on the ninth floor. That wraparound recess, which is approximately 2,200 square feet of space, is the EA. The surface is made up exclusively of plain asphalt roofing paper. The outer perimeter is a parapet wall, made of brick and approximately three feet in height. There are three access points from the interior of the building to the EA. One is a door in a common vestibule area located outside the building elevators, but before the entrance to the combined apartment. This door is armed with a fire alarm and only plaintiffs and the owner have keys which allow the door to be opened without setting off the alarm. The other points of access to the EA are two doorways that exist entirely within the combined apartment.
In their complaint plaintiffs assert three causes of action for: (1) a declaration that the roof terrace is part and parcel of plaintiffs’ tenancy under their lease and the Rent Stabilization Law of 1969 and the Rent Stabilization Code and that they enjoy exclusive access to and enjoyment of it; (2) an alternative declaration that they are entitled to use and occupancy of the roof terrace by reason of adverse possession; and (3) a permanent injunction against defendants entering the roof terrace without plaintiffs’ permission. Plaintiffs also seek their attorneys fees from defendants. Defendants interposed an answer denying the material allegations in the complaint, asserting three affirmative defenses and two counterclaims. The first counterclaim seeks attorneys fees and the second counterclaim seeks a declaration that the roof, and access and use thereof, is not part and parcel of plaintiffs’ tenancy under the lease agreement and Rent Stabilization Law of 1969 and the Rent Stabiliza *922 tian Code and that there is “nothing more” than a license that is revocable by the owner.
The parties each previously moved for summary judgment, which was denied by Honorable Emily Jane Goodman. The lower court decision was then affirmed on appeal. (Garza v 508 W. 112th St., Inc., 52 AD3d 271 [1st Dept 2008].) The Appellate Division held that there were issues of fact regarding whether a roof terrace existed within the meaning of the lease between the parties.
A bench trial was held in this matter on July 22 and September 26, 2008. Plaintiffs’ only witness was coplaintiff, Elizabeth Garza. Defendants called two witnesses, Ronald Einziger, the president of Nunz, and an architect, George Cutsogeorge. In addition, the deposition of John Burke, former president of 508 West, was admitted into evidence in lieu of him testifying personally at trial. Posttrial submissions were completed on October 30, 2008.
In 1982 Garza moved into the building. She rented what was then known as apartment 9B, which was located on the top floor of the building. At that time, there were two separate apartments on the ninth floor; apartment 9A (on the south side) and apartment 9B (on the north side). 9B was a one-bedroom apartment. Along with the door leading from the elevator vestibule to 9B, there was also a door from the apartment that led directly out to the EA. 9A was a studio apartment directly adjacent to 9B. It was rented to a tenant named Edward Smith. 9A also had a door from the elevator vestibule that led into the apartment and another door that led directly out to the EA.
Garza signed a written lease for 9B. The owner’s rental agent, Meryl Stewart, represented to Garza that the north side of the EA was for Garza’s use and enjoyment. The lease described the premises as: “Apartment (and terrace, if any) 9B in the building 508-10 West 112th Street.” The apartment number and the street address are handwritten. The other portions are preprinted on a rent-stabilized lease form. Paragraph 20 of the preprinted lease provides that: “No one is allowed to use the roof.” At the bottom of the lease paragraph 31, added in handwriting, states “Usage of roof terrace subject to landlord’s approval.” This lease was renewed through 1989.
From 1982 up until the time the apartments 9A and 9B were combined, Garza used what she referred to as the front part of the EA for her own personal use. She kept light weight outdoor *923 furniture on the EA. She also took meals, sunbathed, smoked cigarettes and entertained guests on the EA. She observed Smith making similar personal use of the “back portion” of the EA. No one from 508 West objected to her use of the EA and the only restriction placed on her was not to use furniture or heavy pots that damaged the surface. This was communicated to Garza by John Burke, then the president of 508 West.
Smith passed away in the summer of 1989. At that time Burke offered to rent 9A to Garza. It was agreed by 508 West and Garza that 9A and 9B could be combined into one apartment and that the cost of the renovation would be shared equally between them. In November 1989 Garza signed a new lease (1989 lease) for the combined apartment. The 1989 lease describes the premises as: “Apartment (and terrace, if any) 9B at 508-10 West 112th St. NY NY 10025.” The apartment number and the street address are in handwriting and the other language is part of the preprinted rent-stabilized apartment lease form. The 1989 lease does not contain any language about the use of the roof terrace, and a fortiori there is no language restricting the use of the roof terrace that was contained in the earlier lease.* Paragraph 20 of the 1989 lease states in pertinent part: “No one is allowed on the roof.” The 1989 lease was periodically renewed through December 31, 2006.
The renovation work to combine the apartments was completed some time after the 1989 lease was signed. The combined apartment still retained the doors in each of the separate apartments that directly accessed the EA.
James McBride is Garza’s husband. He moved into the combined apartment in 1991. Thereafter, he became a cotenant during one of the lease renewal periods. The plaintiffs went on to raise a family in the combined apartment. They now live in the combined apartment with their three young daughters. After the apartments were combined, Garza and her family continued to have use of the EA. It was used for recreational purposes, including increased entertaining and Garza began some gardening activities.
*924 While plaintiffs’ use of the EA was exclusive as to the other tenants, it was not exclusive as to the owner. After one incident, when another tenant had a party on the roof, the owner fire alarmed the public access door from the common vestibule. Keys to the door were thereafter held only by plaintiffs and the owner. This measure ensured that only the owner and plaintiffs had access to the EA. The owner, however, continued to have access for repairs, maintenance of the roof and the elevator and cleaning. At one point the owner brought prospective purchasers to the EA. Unless there was an emergency, the owner historically provided the plaintiffs with advance notice before it accessed the EA.
Although Garza and her family members had continual personal use of the EA, it was never listed as an essential service on any registration form filed with the Division of Housing and Community Renewal.
In 2005 a lead remediation project was undertaken by the owner in the combined apartment. Plaintiffs temporarily moved out of the combined apartment and two large sheds were erected on the EA for plaintiffs to store their personal possessions while they were relocated. The project was completed and the plaintiffs moved back into the combined apartment. Notwithstanding the owner’s request that plaintiffs now remove their personal items from the sheds, as of the time of the trial, plaintiffs had not done so.
Discussion
The dispute between the parties is whether the 1989 lease included plaintiffs’ right to use the EA, and if so, were the terms of the use of the EA a revocable license or a required service under the Rent Stabilization Code.
A license connotes use and occupancy of a grantor’s premises while a lease connotes exclusive possession of a designated space, subject to rights specifically reserved by a lessor. (American Jewish Theatre v Roundabout Theatre Co., 203 AD2d 155 [1st Dept 1994].) If an owner allows a tenant to use a portion of the owner’s property that is not part of the demised premises, such use is recognized as a license which is cancelable at will and without cause. Acquiescence in use does not create a right, since the law does not penalize good nature, nor does indifference ripen into a right. (Kohman v Rochambeau Realty & Dev. Corp., 17 AD3d 151 [1st Dept 2005].) The nature of the transfer of absolute control and possession is what differentiates a lease *925 from a license. (American Jewish Theatre v Roundabout Theatre Co., supra.) While the difference is plain enough, in borderline cases the rules can be difficult to apply. (Miller v City of New York, 15 NY2d 34 [1964]; see also Prospect Owners Corp. v Sandmeyer, Dec. 26, 2007, index No. 60112/02.)
Plaintiffs are rent-stabilized tenants and therefore entitled to the protections of the Rent Stabilization Law of 1969 (RSL) and the Rent Stabilization Code (RSC). RSL (Administrative Code of City of NY) § 26-514 entitles them to the continuation of all required services. Some services are essential to the tenancy, the failure of which to maintain may entitle a tenant to a diminution in rent. (Matter of Lillian Goldman Family, LLC v New York State Div. of Hous. & Community Renewal, 12 AD3d 161 [1st Dept 2004].) Other services are considered de minimis, the discontinuance of which does not affect a landlord’s right to collect rent. (Hakim v Division of Hous. & Community Renewal, 273 AD2d 3 [1st Dept 2000]; see generally RSC [9 NYCRR] § 2523.4.) Use of ancillary space to a demised rent-stabilized premises may or may not be a required service depending on the facts and circumstances of a particular case. (Meirowitz v New York State Div. of Hous. & Community Renewal, 28 AD3d 350 [1st Dept 2006]; Matter of Llorente v New York State Div. of Hous. & Community Renewal, 16 AD3d 105 [1st Dept 2005]; Conforti v Goradia, 234 AD2d 237 [1st Dept 1996].) Important considerations include: the point of access; the exclusivity of the use, and the customary use of the space over a long period of time. Access from a door within an apartment is consistent with a required service, while access through a window is not. (Meirowitz v New York State Div. of Hous. & Community Renewal, supra-, Llorente v New York State Div. of Hous. & Community Renewal, supra.) Exclusive use is consistent with a required service, while an incidental building wide access is not. (Matter of Goldman v New York State Div. of Hous. & Community Renewal, 31 AD3d 275 [1st Dept 2006].) Prolonged customary use is consistent with a required service under a lease. (See Conforti v Goradia, 234 AD2d 237 [1996].)
The RSC lists the discontinuance of recreational use of a roof as a de minimis condition. (9 NYCRR 2523.4.) The RSC expressly exempts a situation where the lease itself permits the use of a roof. In addition the list is provided only as a general guideline and the RSC itself contains the following caveat: “there may be circumstances where a condition, although included on the schedule, will nevertheless be found to constitute a decrease in a required service.” (9 NYCRR 2523.4 [e].)
*926 Applying the law to the facts of this case, the court holds that the EA is a “roof terrace,” and consequently a terrace, within the meaning of the 1989 lease and renewals. Plaintiffs’ personal use of the terrace was intended to be ancillary to the tenancy of the combined apartment and it is not a revocable license. As more fully set forth below, the support for this conclusion comes from consideration of the 1989 lease read in conjunction with the 1982 lease, the representations made to Garza at the time she signed the 1982 lease, Garza and her family’s actual personal exclusive use of the EA from 1982 forward, the configured access to the EA through doorways located in the combined apartment and the fact that the owner always knew and condoned plaintiffs’ exclusive use of the EA.
Paragraph 31 of the 1982 lease expressly referred to a “roof terrace.” It provided that use of the roof terrace was subject to the owner’s approval. Implicit in such a provision is an acknowledgment that a roof terrace actually exists. This was further confirmed by representations made by the owner’s representatives at the time the 1982 lease was signed, that as part of her tenancy Garza was to have personal and exclusive use of the front part of the EA.
In the 1989 lease there is no parallel reference to a “roof terrace.” What is significant, however, is that between 1982 and the subsequent lease in 1989, there had been no significant structural changes to the EA. Thus, because a roof terrace existed in 1982, one must have necessarily existed in 1989 as well. The reference to the demised premises as including “a terrace, if any” included the roof terrace that the parties understood to exist at the time.
The additional supportive evidence that the parties intended to give plaintiffs exclusive personal use of the EA in the 1989 lease and renewals thereof, is the actual conduct of the parties. Plaintiffs have always had and actually used the EA in conjunction with their tenancy. They had exclusive access through two doors from within the interior of the combined apartment. Contrary to the owner’s contention, there is no credible evidence that the doors were only to afford access to fire escapes. The third point of access to the EA was through a common vestibule alarmed door, for which only plaintiffs and the owner had a key. John Burke, the president of the prior owner, clearly knew about plaintiffs’ exclusive use of the EA over the years. He had conversations with Garza about the type of furniture permitted on the roof. He attended parties that she hosted on the roof. Plaintiffs’ use of the EA over the years was open. .
*927 Plaintiffs’ permitted use of the EA was to the exclusion of all the other occupants residing in the building. This was made especially clear when an alarmed door was installed by the owner in the common vestibule, effectively prohibiting anyone other than plaintiffs and the owner from having access to the EA.
There is no basis to conclude that the use of the EA was “nothing more” than a revocable license. Indeed the opposite appears true. Thus, in 1982 the lease expressly made the use of the roof terrace subject to landlord’s approval. Such language was consistent with the notion of a license. That operative language, however, was completely omitted in 1989. The omission is consistent with an interpretation that use of the EA as a terrace was part of the lease of the demised premises.
The court rejects the owner’s contention that its right of access demonstrates that plaintiffs’ rights to use the EA was not sufficiently exclusive to make the interest a lease as opposed to a license. The express terms of the lease gives the owner a right of reasonable access to make repairs and/or perform necessary or desirable work. Over the years, with one recent exception, the owner’s access to the EA has only been to do landlord type things. This expressly reserved right of access does not convert the tenancy of the EA into a license.
George Cutsogeorge, an architect, testified on behalf of the owners at trial. He testified that the construction of the EA surface was inconsistent with recreational purposes. In fact, he claims that recreational use will damage the roof membrane. His testimony does not negate the fact that the parties intended that plaintiffs be able to use the EA when they entered into the lease in 1989. It is undisputed that John Burke told Garza to be careful about using certain furniture and planting pots because the roofing surface was vulnerable. She was not instructed, however, not to use the EA at all. Quite the contrary, she was told she could use the EA, but to be careful.
Cutsogeorge also testified that plaintiffs’ use of the EA may violate the building code. The court cannot make a finding one way or the other on this claim. By finding that plaintiffs’ use of the EA is part of their rent-stabilized tenancy, the court is not condoning any use of the EA that violates the law. The issues of whether the use violates the law, what must be done to make the use lawful, who is legally and financially responsible for any work to be done and any collateral disputes relative thereto are not before the court.
The owner also argues that plaintiffs’ use of the EA was de minimis. The court disagrees. While the ESC generally lists *928 recreational use of a roof a de minimis service, it carves out an exception when the use thereof is in the lease itself. Here the reference in the description of the demised premises to include a terrace if any, is an express right in the lease to use the roof. Moreover, the facts of this case prove that the use was not de minimis. It is comprised of a huge area that wraps around the entire combined apartment, it is used by plaintiffs to the exclusion of all the other occupants of the building, it is used by them on a regular basis (particularly in nice weather) and it is accessed directly from doors in their apartment. The RSC expressly recognizes that there may be and allows for cases where the facts are inconsistent with a conclusion that recreational use of the roof is a de minimis service.
Accordingly the court finds that plaintiffs are entitled to a declaration on their first cause of action that the roof terrace is part of their tenancy under the 1989 lease as renewed and the Rent Stabilization Law of 1969 and Rent Stabilization Code.
In their second cause of action, plaintiffs seek a declaration on the alternative theory of adverse possession. Plaintiffs do not argue this theory in their posttrial submission. In any event, any claim of adverse possession has been rendered moot by virtue of the court’s decision on plaintiffs’ first cause of action for declaratory judgment. The second cause of action is therefore dismissed.
Plaintiffs also seek a permanent injunction preventing the owner from having access to the EA without their prior permission. This relief is denied. In order to obtain a permanent injunction, the party seeking such relief must show irreparable injury and the absence of an adequate legal remedy. (Town of Liberty Volunteer Ambulance Corp. v Catskill Regional Med. Ctr., 30 AD3d 739 [3d Dept 2006].) Sometimes a permanent injunction is an appropriate remedy for a continuing trespass. (See Franco v Piccilo, 49 AD3d 1182 [4th Dept 2008].) The plaintiffs, however, have not shown a trespass, let alone a continuing one. They have not shown the absence of a legal remedy or the need for an injunction at this time.
The owner in this case is entitled to reasonable access to the EA. This right is conferred under the lease itself. Reasonable access does not always require prior tenant permission, particularly in cases of emergencies. The owner in this case mostly accessed the EA to make repairs. In addition when the owner was trying to sell the building, it gained access to show the EA to prospective purchasers. Plaintiffs only raised one *929 instance where the owner gained access to the EA without their permission for the purpose of doing something not authorized under the lease or law. While this litigation was pending, the owner went onto the EA and took pictures for the purposes of this litigation. Since the incident was isolated and there is no continuing problem of unauthorized and/or unreasonable access, no permanent injunctive relief is warranted. The third cause of action for permanent injunctive relief is, therefore, dismissed.
The court rejects defendants’ affirmative defense that the plaintiffs have failed to state a cause of action. Plaintiffs have stated a viable claim for a declaratory judgment. CPLR 3001 permits this court to render a declaratory judgment regarding the rights and legal relations of parties where there is an actual and otherwise justiciable controversy before it. (Remsen Apts, v Nayman, 89 AD2d 1014 [2d Dept 1982], affd 58 NY2d 1083 [1983]; Buller v Goldberg, 40 AD3d 333 [1st Dept 2007]; 40-56 Tenth Ave. LLC v 450 W. 14th St. Corp., 22 AD3d 416 [1st Dept 2005].)
The defendants failed to raise any arguments in support of their affirmative defense of statute of limitations. It is, therefore, rejected by the court.
Each of the parties seeks to have the other pay its legal fees. No arguments were raised regarding fees at trial or in posttrial submissions. As a practical matter, this issue is usually not raised until the parties are in a position to know which one of them has prevailed on the underlying action. (Berman v Dominion Mgt. Co., 50 AD3d 605 [1st Dept 2008]; Village of Hempstead v Taliercio, 8 AD3d 476 [2d Dept 2004].) Even a prevailing party to a litigation cannot recover its legal fees from the other side unless there is an agreement, statute or court rule authorizing same. (Matter of A.G. Ship Maintenance Corp. v Lezak, 69 NY2d 1 [1986].) The court, therefore, permits a motion for legal fees to be made within 60 days of the date of this decision. Any such motion shall include not only factual justification for the amount of the fees sought, but also legal justification for permitting such an award in movants’ favor.
Defendants’ (1) counterclaim for a declaration and (2) affirmative defense that use of the EA is nothing more than a revokable license are both denied.

 There is a handwritten line located under the words “and terrace, if any.” and next to word “Bank.” The parties dispute whether the line is emphasis for the underlined words or a reference to the fact that no bank was used in the transaction. Plaintiffs contend that this issue has already been determined by the Appellate Division and that such determination is law of the case. Because this court’s conclusion on the underlying causes of action is the same regardless of what the handwritten line refers to, this collateral dispute by the parties is not resolved in this decision.